[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action brought under the provisions of Connecticut General Statutes 12-119. The plaintiff claims that the assessment of its property on October 1st, 1987, by the Bridgeport assessors was manifestly excessive and in disregard of the statutory requirements for determining evaluation. The defendant City has admitted that the tax has been paid and that the plaintiff is the owner of the property described in the complaint and has denied all of the other allegations of the complaint. (The answer did not come in until after the trial.)
The plaintiff, Second Stone Ridge Cooperative, Inc., is a nonpublic, subsidized cooperative housing project consisting of 189 duplex, two story units in 26 buildings, constructed in 1964. The project is insured and regulated through the U.S. Housing and Urban Development (HUD), 221(d)(3) Cooperative, Low Income Subsidized Housing Program.
The land consists of 14.99 acres with frontage on Stone Ridge Road and Yaremich Drive.
The housing units are occupied by shareholders in the CT Page 1182 corporation under an occupancy agreement. The shareholders pay a monthly carrying charge based on the family's pro rata share of funds necessary to meet a balanced budget comprised of operating expenses, debt services and reserves for maintenance and repairs. To qualify for membership in the cooperative, the income of the resident must be within the income limits per family size set by HUD pursuant to 221(d)(3) of the National Housing Act, Title 2, as amended.
Any excess in income generated by the cooperative must go into a reserve fund solely for maintenance and repair and subject to HUD approval for its expenditure. The cooperative may not retain for its own use any operating income in excess of the operating expenses (see exhibit N, page 5).
The plaintiff claims, first, that the method used by the Bridgeport assessor in making the October, 1987, assessment was contrary to the appraisal methods permitted under the statute for determining the fair value of the plaintiff's property. The plaintiff also claims that the tax levied should be pro rated between it and HUD because many of the bundle of rights associated with ownership belong to HUD not to the plaintiff under the regulatory agreement and mortgage covenants between the cooperative and HUD.
To take the second claim first, the law seems to require that the title holder be the person or entity subject to the tax. See Connecticut General Statutes 12-64 (rev'd. to 1989).
The land records of Bridgeport clearly identify the plaintiff as the title holder of the property in question. See volume 1284 at pages 570 to 575 of the Bridgeport Land Records. (See plaintiff's exhibit A.)
Consequently, the plaintiff, Second Stone Ridge Cooperative Corporation is the appropriate entity subject to the tax.
The claim that the assessment should be shared by HUD because of the control HUD exercises over the property is a novel one for which no authority has been cited. One case seems to imply the opposite to be true, see Federal Compress 
Warehouse Company v. McLean, 291 U.S. 17, 19, 54 Sup. Ct. 267,268 (1934). Consequently, that claim is denied.
As to the first claim, however, that the City of Bridgeport used the wrong method in making the assessment of the plaintiff's property, there would appear to be merit to this claim. CT Page 1183
First, the city's original assessment was on the basis of cost of replacement. However, there was no data on which to make that evaluation, and none was provided by the person who testified for the city.
Apparently, the city's counsel conceded that when he presented as his expert Mr. Edwin Haflich who evaluated the property on an income capitalization basis as of October 1st, 1983. However, in using the income capitalization method, Mr. Haflich treated the plaintiff cooperative corporation as a for, profit, apartment rental complex with no restrictions. His comparables also did not appear to the court to be truly comparable both in terms of location (except for two) and in terms of their being all for profit rental units.
Moreover, Mr. Haflich's appraisal states, on page 8 thereof, that he was not furnished with either income or expense figures for the subject. Since he was not retained until the trial had started, it is difficult to understand why he did not have those figures which were provided by the plaintiff in the appraisal report submitted by the plaintiff's expert, William N. Kinnard, Jr., Professor. Since he did not have the actual figures, he then proceeded to create figures from his "experience" and the rentals he found for the various rental units he listed, which were all for profit rental facilities.
In sum, the court finds Mr. Haflich's appraisal to have no appropriate data as the basis for his conclusions.
It is significant, however, that he apparently agrees with plaintiff's expert that the only feasible method of evaluating the plaintiff's property is through income capitalization. (See exhibit 9, page 7.)
The difference between the city's assessment of $2,516,864.00 on the basis of a total market value of $3,595,520.00 is substantially higher than the market value of the plaintiff's expert which amounts to $1,700,000.00. Since a tax is levied on the basis of 70 per cent of the market value, it is clear that there is a substantial difference in the amount of the tax based on $1,700,000.00 and that based on $3,595,520.00.
That difference is certainly sufficient to find that the assessment was manifestly excessive, and it was obviously arrived at by disregarding the appropriate method of determining evaluation according to both plaintiff's and defendant's experts. CT Page 1184
The defendant has raised the question of whether the appraisal by the plaintiff should have been as of 1983 instead of 1987. The city has also argued that since the assessors may not change the assessment after the revaluation in 1983 until the next revaluation ten years later in order to conform to market changes that it is not possible to change this valuation in 1987. However, the reason for changing this evaluation in 1987 is because the method used in arriving at the evaluation was wrong; that is, the property was wrongfully assessed, and the remedy for that is provided in 12-119 of the Connecticut General Statutes. If that statute is to have any meaning, it must be possible to change assessments between the revaluations because of wrongful assessments even though you may not change it for changes in market conditions. See Ralston Purina Co. v. Board of Tax Review, 203 Conn. 425 at 436 (1987).
In the Ralston case the issue was whether the assessment should be adjusted to reflect changes in market conditions. The court held it could not be reassessed between the decennial evaluations, but it also stated that there were exceptions and listed the exceptions at page 436 to include destruction or expansion of property, substantial change in its use or zoning classification, or decision by the taxpayer to go out of business. There was no discussion in that opinion of the application of 12-119 which provides a remedy for a wrongful assessment to be challenged within a year after that assessment, and that is the present case.
The court made no special visit to the premises but is very familiar with the area. One of the facts which has not been emphasized is that this cooperative is within a block of Beardsley Terrace, a high rise public housing project for low and moderate income families which has been the subject of so many problems that it is now in the process of demolition and replacement by town houses. Thus, the neighborhood in which this project is located has some less than desirable characteristics.
It is in part because of the neighborhood as well as the fact that the project in question is under a 40 year regulatory agreement and mortgage with HUD which restricts its use to low and moderate income families and permits no profit that requires the court to find that this is the highest and best use of the land in question. When it was built, there was an obvious need for housing for low and moderate income families and since they have had an almost zero occupancy rate since its construction, that situation continues to exist. In fact, the situation may be even worse today given the number of homeless families in the area and the shelters that have been established in order to provide for them. CT Page 1185
Given the restrictions on the cooperative management which prevents the corporation from using any of the income for any purposes other than repairs or maintenance and only with HUD approval and which requires that the carrying charges paid by the residents equal the expenses so that there is no profit, it would appear on the face of it that its marketability would be severely limited if it existed at all.
It would appear that its highest and best use is the use to which it is presently being put. See Rochester Urban Renewal Agency v. Patchen Post, Inc., 45 N.Y.2d 1, Ct. App. N.Y., June 13, 1978. In this case the question was the determination of the amount to be paid the respondents for the condemnation of their property by eminent domain. The property in question were clubhouses used as Posts for a veterans' organizations and a local fraternal organization. The court held this type of property lacks a market price because it was a specialty and, therefore, the determination of its value was not to be on the basis of a market price but on the basis of reproduction costs less depreciation. That when property is of a kind seldom traded, it lacks a market price, and there must, accordingly, be recourse to some other method of valuation. It by nonprofit agencies as centers for community service commonly fall within this category.
In other words, the court determined that the use to which the property had been put by its owners was the highest and best use.
In this case anyone seeking to buy the property, were HUD to permit its sale (its approval is essential), would have to understand he could not make a profit and could only use the property as it is presently being used under the restrictions on its use giving HUD virtually total control thereof until 2002. See exhibit M, pages 19 and 20.
To the same effect, but in a different context, the Connecticut Supreme Court, in the case of Executive Square Limited Partnership v. Board of Tax Review, 11 Conn. App. 566,572-573, held that the evaluation of the property of the plaintiff, which was a federally subsidized apartment complex for the elderly, had to include consideration of the restrictions, financing and federal subsidy. On that basis, the trial court found that there was no market that would compare with the housing afforded by the plaintiff's apartment other than section eight housing. The trial court then went on to find that section eight housing has its own market and, therefore, the rental established for the subject property was market rent. The appellate court found no error in this CT Page 1186 decision. By finding that the rent consisting of both what the tenants paid and what the subsidy was, was "the market" rent, the court was finding that the rent was more than the market rent for nonsubsidized properties.
The principle, however, is the same here where property is federally subsidized, federally regulated and where the income is restricted by those regulations. See also Uniroyal v. Middlebury, 174 Conn. 380 (1978); Federated Department Stores v. Board of Tax Review of Stamford, 162 Conn. 77
(1971).
It should be remembered, also, that the whole purpose of the construction of this housing in Bridgeport was to meet a felt need, to provide low and moderate income families with affordable housing. The city cooperated in this venture by changing the zoning to permit multi unit, garden type apartments. Should the defendant's assessment of the property be determined by rents paid in for profit apartments anywhere in the city this would thus mean an increased tax to the plaintiff corporation, and that increase would be passed on to the residents in terms of higher carrying charges since those charges must be sufficient to meet the expenses. This would appear to be defeating the whole purpose of providing affordable housing for low and moderate income families.
The plaintiff has claimed that should the court find that the assessment was manifestly excessive and in disregard of the statutory requirements for valuation, it should require the reduction of the tax paid from 1983 to 1987 as well as the one for 1987. Since there was no such claim in the complaint and the defendant, therefore, had no opportunity to reply to that, the court is not in a position to make that kind of determination.
The court does find that the assessment in question was wrongful in that it was derived from an inappropriate method of evaluation contrary to the statutes and that it was manifestly excessive. The court also finds that the evaluation provided by the plaintiff's expert appears to be reasonable and justified by the data he provided and that, therefore, the 1987 assessment of the plaintiff's property should be reduced to conform with the evaluation set forth by the plaintiff's expert, that is, $1,700,000.00.
Judgment may be rendered for the plaintiff.
MARGARET C. DRISCOLL STATE TRIAL REFEREE. CT Page 1187